UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
BROWN MEDIA CORPORATION and ROY
E. BROWN,

                  Plaintiffs,

      -against-

K&L GATES, LLP, EDWARD M. FOX and
ERIC T. MOSER,

                  Defendants.
------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
15-cv-00676(ADS)(ARL)

**APPEARANCES:**

**LAW OFFICE OF DANIEL L. ABRAMS, PLLC**
*Attorney for the Plaintiffs*
31 Penn Plaza
132 W. 31st Street, 15th Floor
New York, NY 10001

**SILVERMAN ACAMPORA LLP**
*Attorneys for the Defendants*
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753
      By:    Anthony C. Acampora, Esq., Of Counsel

**SPATT, District Judge:**

On or about November 27, 2013, the Plaintiffs Brown Media Corporation

("Brown Media") and Roy E. Brown ("Roy") commenced this action against the

Defendants K&L Gates, LLP ("KLG"), Edward M. Fox ("Fox"), and Eric T. Moser

("Moser", together with KLG and Fox, the "Defendants").

The claims in this action arise from a related bankruptcy proceeding. Therefore, the case was automatically referred to the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

On December 1, 2014, the Defendants filed a motion, pursuant to 28 U.S.C. § 157(d); Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.") 5011; and Local Bankruptcy Rule 5011-1, to withdraw the automatic reference and have the case proceed before this Court. On or about January 14, 2015, while that motion was pending, the Defendants filed a second motion, pursuant to Fed. R. Bankr. P. 7012 and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6), to dismiss the complaint.

On January 28, 2015, this Court withdrew the reference from the Bankruptcy Court and will decide the Defendants' motion to dismiss.

## I.     Factual Background

The following facts are drawn from the complaint and are construed in favor of the Plaintiffs.

## A.     The Parties

Brown Media is a Delaware Corporation, which was established in March 2010 for the express purpose of acquiring the assets of an entity known as Brown Publishing Company and its affiliated entities (collectively "Brown Publishing").

Roy is an individual residing in Cincinnati, Ohio. He presently owns the substantial majority of the stock of Brown Media, and is the former CEO,

shareholder, and director of Brown Publishing. Roy is also a part of Brown Publishing's management group.

The Defendant KLG is a law firm with approximately thirty-seven offices located throughout the United States and abroad. The individual Defendants Fox and Moser are attorneys and former partners at KLG, both of whom currently reside in New York.

## B.    The Pre-Bankruptcy Facts

Brown Publishing is a closely-held corporation, which is controlled by Roy; his brother Clancy; his parents, Bud and Joyce; the company's former General Counsel, Joel Dempsey ("Dempsey"); and one Joel Ellingham ("Ellingham"). The complaint refers to these individuals collectively as the "Managers." Brown Publishing is a family business, having been founded in 1920 by Roy's grandfather.

Although described only vaguely in the complaint, it appears that, at some unspecified time, Brown Publishing received financing from a company known as Windjammer Capital ("Windjammer"). In connection with their financing arrangement, Windjammer apparently retained an equity "put" option, so that, in the event the loan was not repaid, Windjammer could exercise its option and force the sale of Brown Publishing's assets to recoup its investment.

For reasons not set forth in the complaint, it is alleged that in late 2008, although not yet in default, the Managers feared that Windjammer might soon exercise its option, which would result in their losing control of Brown Publishing.

As a result, the Managers sought legal advice as to how best to maintain control of the enterprise.

In this regard, on or about December 12, 2008, allegedly on behalf of himself and the other Managers, Dempsey contacted Fox and KLG. Allegedly, Dempsey supplied Fox and KLG with a document entitled "Warrant Put Memo" (the "Memo"), which sets forth the issues about which the Managers required legal advice. It is unclear who prepared the Memo, but, as to its contents, the complaint alleges as follows:

> The [ ] Memo ask[ed] KLG for advice related to, *inter alia*, the legal ramifications of a proposed transaction whereby the Managers create a new LLC and Managers Roy, Dempsey, and Ellingham acquire the assets of Brown Publishing through the new LLC. This proposed transaction was to take place outside of bankruptcy. Legal issues specifically identified in the [ ] Memo included what actions to take, if any, with regards [*sic*] to Windjammer Capital, possible successor liability related to the proposed transaction, what state would be an advantageous one for incorporation of the new LLC, the tax consequences to the Managers, shareholder disclosure requirements, if any, and other issues pertaining to Brown Publishing's lenders.

See Compl. ¶ 20.

It is alleged that the Memo did not contemplate a bankruptcy. In fact, as noted above, Brown Publishing allegedly was not in default of any loans at this time and the Managers were specifically seeking advice about how to retain equity control through a non-bankruptcy transaction.

Allegedly in response to the Memo, KLG and the individual Defendants provided advice directly to Roy and Dempsey and billed the Managers for the time spent on related legal services. In particular, KLG allegedly advised the Managers

on ways to reduce the possibility of so-called successor liability – *i.e.*, the possibility that the new LLC would succeed to the debts and liabilities of Brown Publishing after acquiring its assets. In order to minimize this possibility, KLG allegedly advised Roy not to participate in any eventual transaction, and advised Dempsey to relinquish his shares in an entity known as Brown Media Holdings Company ("Media Holdings"), so that he could become the majority owner of the new LLC.

For reasons not explained in the complaint, by March 2009 it had allegedly become "imminent" that Brown Publishing would default on its loan agreement with Windjammer. <u>See</u> Compl. ¶ 26. Accordingly, the Managers allegedly took a series of actions to protect Brown Publishing's interests.

The Court notes that the allegations in the complaint relating to the events that occurred in and around March 2009 are undeveloped and disorganized. From the complaint, the Court is unable to form a clear understanding as to what was happening at that time or why it matters in this case. Nevertheless, the following facts are apparent:

In or about March 2009, the Managers allegedly decided to enter into a non-bankruptcy transaction that was structured similarly to the one contemplated in the Memo. The complaint does not provide any supporting details concerning this transaction. From the complaint, the Court cannot determine the parties to the transaction or any of the relevant terms or conditions. However, it is alleged that, in proceeding with this transaction, the Managers followed advice provided by KLG,

namely, Roy did not participate and Dempsey relinquished his shares in Media Holdings.

At or about the same time, in March 2009, Windjammer allegedly commenced a lawsuit in Ohio, seeking to invalidate this transaction. Again, the complaint does not provide any supporting details, including the identities of the parties to that action. Nor does it specify whether the action was commenced in state or federal court; or what legal theory Windjammer asserted. Nevertheless, an unidentified Ohio court allegedly approved the transaction and authorized it to move forward.

However, again for reasons not explained in the complaint, at some unspecified time, the Managers allegedly rescinded the March 2009 transaction and, on advice of KLG, proceeded to bankruptcy.

In this regard, it is alleged that when "[t]he March 2009 transaction did not solve the problems associated with Brown Publishing's debt," Dempsey contacted Fox in early May of 2009 for advice. See Compl. ¶ 26. From May 2009 to June 2009, KLG allegedly advised the Managers that a sale of Brown Publishing's assets in bankruptcy was their best strategy in order to retain control of the company.

Further, KLG apparently advised Roy and Dempsey, in their individual capacities, to attempt to purchase Brown Publishing's assets "through a 363 sale." The Court assumes that the Plaintiffs are referring to Section 363 of the United States Bankruptcy Code, 11 U.S.C. § 363 ("§ 363"), which authorizes the sale of a bankruptcy debtor's assets outside of the ordinary course of business. The complaint alleges that KLG suggested that, if the Managers, acting through the

new LLC, purchased Brown Publishing's assets in a sale pursuant to § 363, they "could eliminate successor liability and related tax concerns, and that Roy's family members could potentially join the purchase."

On an unspecified date in 2009, KLG allegedly notified Roy and Dempsey that the firm was interested in serving as Brown Publishing's "restructuring counsel" in its bankruptcy proceeding. According to the complaint, KLG did not disclose any conflict of interest created by simultaneously (a) representing Brown Publishing in connection with its bankruptcy filing; and (b) advising the Managers in connection with their efforts to retain control of Brown Publishing and acquire its assets. In particular, KLG allegedly did not seek or obtain a waiver from the Managers. Nor did the firm seek a consent to represent both the Managers and Brown Publishing.

In July 2009, Brown Publishing allegedly retained KLG as counsel. After being so retained, KLG allegedly continued to advocate for a sale of Brown Publishing's assets to the Managers by way of a sale in bankruptcy pursuant to § 363, despite the Managers' expressed preference for an out-of-court restructuring. In this regard, KLG allegedly began preparing a strategy by which the Managers would maximize their odds of prevailing in a public auction for the company's assets. In particular, in August 2009, KLG and Dempsey began preparing a so-called "stalking horse asset purchase agreement."

Although not described in the complaint, the Court will take judicial notice of the basic concept of a stalking horse bid in bankruptcy. As one court has noted:

> A stalking horse bidder in a bankruptcy proceeding makes an initial
> bid to purchase the assets of a debtor on the theory that the initial
> bidder's "initial research, due diligence, and subsequent bid may
> encourage later bidders." In re 310 Associates, 346 F.3d 31, 34 (2d Cir.
> 2003). Stalking horse bidders often contract to receive a "break-up fee"
> compensating it for its bidding activities should a higher bid ultimately
> emerge and win an eventual asset auction. See In re Integrated Res.,
> Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992).

In re MSR Resort Golf Course LLC, 13-cv-2448, 2014 U.S. Dist. LEXIS 2043, at *6 n.3 (S.D.N.Y. Jan. 7, 2014). As the Second Circuit has succinctly stated: "A 'stalking horse' contract is a first, favorable bid strategically solicited by the bankrupt company to prevent low-ball offers." In re WestPoint Stevens, Inc., 600 F.3d 231, 239 n.3 (2d Cir. 2010). The stalking horse asset purchase agreement in this case will be referred to as the "APA."

In addition to preparing the APA, KLG also allegedly provided the managers with specific advice concerning, *inter alia*, how much to bid and how to frame their bid so as to maximize the chances that a bankruptcy court would approve an eventual sale. Further, KLG allegedly provided advice regarding the formation of Brown Media, the entity into which the purchased assets of Brown Publishing would be transferred, namely, the "stalking horse." KLG also allegedly provided advice as to the benefits of filing the bankruptcy petition in New York.

The complaint alleges that KLG was also active in seeking funding for the Managers' planned purchase of Brown Publishing's assets. In this regard, allegedly, "KLG provided advice to the Managers on the price they should offer, and revised documents drafted by the Managers and sent to potential capital" investors. Compl. ¶ 35. Also, apparently, the individual Defendant Fox referred the Managers

to a friend of his at W&L Ross, a company that acquires other, distressed companies, and participated in a conference call with the Managers and individuals at Goldman Sachs.

Allegedly, KLG provided advice to Roy and Dempsey regarding the Managers' efforts to convince Brown Publishing's lenders to finance the Managers' purchase. Among other things, KLG allegedly made extensive edits to a memo prepared by Roy on behalf of himself and the other Managers for this purpose.

It is further alleged that the Managers eventually obtained a funding commitment from an entity known as Guggenheim Partners ("Guggenheim") to support their purchase offer. The complaint alleges that KLG worked directly with Guggenheim and the Managers to prepare the APA and encouraged Guggenheim to provide a debtor-in-possession loan to infuse capital into Brown Publishing during the Chapter 11 proceeding and preserve the value of its assets.

However, shortly before Brown Publishing's bankruptcy filing, KLG allegedly urged the Managers, and their new LLC, to obtain separate counsel. In particular, Fox allegedly recommended that the Managers retain his friend and former partner, Richard Levy, Esq. The Managers agreed to retain attorney Levy. However, by the time they did so, Brown Media had already been formed for the purpose of placing a stalking horse bid and ultimately acquiring Brown Publishing's assets; and substantive portions of the APA were already negotiated and in place.

On the eve of the bankruptcy filing, KLG also allegedly suggested that Brown Publishing hire one Tom Carlson ("Carlson"), an alleged "connection" of Fox, to

serve as an independent director with specific responsibility for the sale process. Following this advice, Brown Publishing did so. According to the complaint, at the time of his hire, Carlson was unemployed, had no background in selling media assets, and had never before served on a board of directors. Further, it is alleged that Fox summarily rejected six alternative candidates for the independent director position, all of whom had prior experience selling media assets and all of whom were believed to be independent. Rather, Fox allegedly was adamant that Carlson obtain the position. The Plaintiffs allege that Carlson did little actual work; admitted that he had not read any of the bids for the purchase of Brown Publishing's assets in full; and had not performed any assessment of the value of any of the assets.

## C.    The Facts Relating to the Bankruptcy Filing

On April 30, 2010, Brown Publishing filed for Chapter 11 bankruptcy in the Eastern District of New York. The complaint alleges that, "[a]s part of the filing, KLG sought to be and was eventually retained as [Brown Publishing's] Counsel." Compl. ¶ 45. Apparently, KLG submitted a disclosure statement (the "Disclosure Statement") in furtherance of the Bankruptcy Court's approval of its retention as the debtor's counsel. Allegedly, this Disclosure Statement did not disclose KLG's relationship with the Managers. The complaint also alleges that the Disclosure Statement did not disclose "the extent of Defendants' relationships with all of the members of the Bank Group and many other major creditors." Compl. ¶ 47. However, the complaint does not define the term "the Bank Group"; does not

identify alleged creditors, other than Windjammer; and, in using this term, does not assert any factual allegations regarding KLG's purported relationships with the so-called Bank Group or any other creditors.

After the bankruptcy filing, but shortly before the execution of the APA, Brown Publishing allegedly received a credit bid by an entity referred to in the complaint as "the PNC Bank Group." This term is also not defined and, except as discussed later in this opinion, is not otherwise described in the complaint. Apparently, the PNC Bank Group's bid was rejected as inferior to the Managers' stalking horse bid.

On May 4, 2010, Brown Publishing, allegedly through Carlson and KLG, executed the APA and sought the Bankruptcy Court's approval of the sale of its assets to the Managers, through Brown Media, the newly-formed LLC. The APA allegedly included an assumption of contracts and leases in the purchase price, which the parties represented to the Bankruptcy Court was "a necessary component of the bargain that [Brown Publishing], in the exercise of [its] sound judgment, ha[d] reached with Brown Media." Compl. ¶ 49.

Although not specifically alleged in the complaint, it appears that the Bankruptcy Court approved the stalking horse bid and various procedures for an eventual sale of Brown Publishing's assets.

It also appears that, at some unspecified time, an unsecured creditors committee was formed. Again, the complaint fails to assert any facts relating to this process, but the Court notes that Section 1102 of the Bankruptcy Code

provides, in relevant part, that: "as soon as practicable after the order for relief under Chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate." 11 U.S.C. § 1102(a). This committee "shall ordinarily consist of the persons, willing to serve, that hold the seven largest claims against the debtor of the kinds represented on such committee." Id. § 1102(b)(1). Among other things, the committee: (i) provides access to information to other unsecured creditors who are not appointed to the committee; (ii) solicits and receives comments from such creditors; and (iii) is subject to court orders that may compel reports and/or disclosures to such creditors. Id. § 1102(b)(3)(A)-(C).

On June 1, 2010, KLG apparently requested that Roy "brief" the unsecured creditors committee that was formed pursuant to Brown Publishing's filing. The individual Defendant Fox allegedly instructed Roy about how to answer the members' questions concerning his personal interests relative to Brown Publishing. In this regard, the Plaintiffs allege that, although the Managers had retained attorney Levy to represent them, KLG continued to treat them as clients.

On June 16, 2010, Fox, Roy, and Dempsey met for lunch to discuss issues relating to the bankruptcy proceeding. Allegedly, attorney Levy was not present, nor did Fox suggest that he should be.

**D.    The Foreclosure Action and the Defendants' Alleged Fraudulent Scheme**

The complaint alleges that an entity known as CRJ Investments, LLC ("CRJ") was an affiliate by common ownership of Brown Publishing.  In particular, CRJ was owned by Roy, Dempsey, and Roy's brother, Clancy.  CRJ allegedly owned the real property where Brown Publishing conducted all of its manufacturing and a substantial majority of its profit-generating operations.  Apparently, CRJ was also a party to valuable leases with Brown Publishing, although no particular leases are identified.  The complaint suggests that, pursuant to the terms of the APA, the Managers would acquire these leases through the ultimate acquisition of Brown Publishing's assets.

It is alleged that CRJ's "sole lender" was Huntington Bank ("Huntington").  Allegedly, Huntington is a member of the so-called PNC Bank Group, which, as described above, had submitted a last-minute competing offer for Brown Publishing's assets.  In addition, Huntington is a creditor of Brown Publishing and, importantly, a client of KLG.

The complaint does not specify the type of "lending" in which Huntington engaged, or whether Huntington possessed a security interest in the subject real property owned by CRJ.  However, on June 14, 2010, Huntington allegedly filed a foreclosure action against CRJ in an Ohio state court.  The Plaintiffs assert that Huntington's commencement of the foreclosure action violated the automatic bankruptcy stay pursuant to 11 U.S.C. § 362, and was intended solely to undermine the Managers' efforts to acquire Brown Publishing's assets.

13

Dempsey, allegedly in his capacity as Brown Publishing's General Counsel, directed KLG to promptly file a motion to enforce the automatic stay. KLG, through Fox, allegedly agreed to do so, but, according to the complaint, waited until after the auction of Brown Publishing's assets before filing the motion.

It is alleged that KLG's delay in filing the motion to stay the foreclosure action was strategic and designed to benefit Huntington, another of its clients. In particular, the complaint appears to depict the following fraudulent scheme allegedly perpetrated by KLG. The PNC Bank Group, of which Huntington is a part, submitted a competing bid for Brown Publishing's assets. That bid was rejected as being inferior to the Managers' stalking horse bid. However, the PNC Bank Group's bid was deemed inferior, in part, because the APA assigned a substantial value to CRJ's leases with Brown Publishing. In order to make the PNC Bank Group's bid *superior* to the Managers' stalking horse bid, KLG, with privileged knowledge of the strategic importance to the Managers of the CRJ leases, allegedly maneuvered to reduce the value of CRJ's leases – a result that could be accomplished if a foreclosure action were pending against it at the time of the action. Thus, the complaint asserts that KLG deliberately refrained from interrupting the foreclosure action so that CRJ's leases would be stripped of their value in the bankruptcy proceeding, and that the PNC Bank Group, which included a client of KLG's, would have the prevailing bid for Brown Publishing's assets.

As summarized in the Plaintiffs' legal memorandum: the Defendants "use[d] Huntington's illegal foreclosure as a pretext to devalue the Managers' assumption of

[the CRJ] leases to *zero*, severely impairing the Managers' pre-auction bid consideration to the benefit of the bid of Defendants' bank clients in the PNC Bank Group." Pl. Opp. Memo at 3 (emphasis in original).

It warrants noting that Carlson, an alleged friend of the individual Defendant Fox, allegedly testified in a separate proceeding that, after receiving advice from KLG, he decided to "lay low" until after the auction was completed. According to the Plaintiffs, this conduct was inconsistent with his obligations as an independent director of Brown Publishing and was "steered" by KLG in order to benefit Huntington.

Based on the circumstances outlined above, KLG and Carlson allegedly declared that the PNC Bank Group's bid was the superior bid, thereby necessitating an auction of Brown Publishing's assets.

E.     **The Auction**

On July 19, 2010, the auction was held at KLG's New York offices.

Having been outbid by the PNC Bank Group for substantially all of Brown Publishing's assets, the Managers allegedly bid on a lesser group of assets than those which were envisioned in the APA. Despite initially being declared the high bidder for those assets, Guggenheim allegedly withdrew its funding before the Managers could close the transaction. In this regard, the complaint vaguely alleges that Guggenheim's decision to withdraw was influenced by "the Huntington Foreclosure and other problems in the closing process related to the fact that Brown

Media was not able to acquire all of the assets envisioned by the APA." Compl. ¶ 64. No supporting details concerning this statement are provided.

The PNC Bank Group was allegedly successful in acquiring most of Brown Publishing's assets.

After the conclusion of the auction, KLG successfully moved in the Huntington foreclosure action to enforce the automatic bankruptcy stay. However, by then, the PNC Bank Group had already acquired Brown Publishing's assets.

Based on the allegations outlined above, the Plaintiffs assert the following causes of action: (i) breach of fiduciary duty based on (a) the Defendants' failure to secure a waiver of the conflict presented by their dual representation of the Managers and Brown Publishing, (b) the Defendants' failure to disclose their relationship with members of the PNC Bank Group, and (c) the Defendants' participation in the scheme described above; (ii) tortious interference with prospective economic advantage based on the Defendants' interference with the relationship between the Managers and Brown Publishing, as reflected in the APA; and (iii) common law fraud based on the Defendants' breach of their duty to disclose potential conflicts of interest.

**F.    The Instant Motion**

Presently before the Court is a motion by the Defendants to dismiss the complaint for its failure to state a claim upon which relief can be granted. In particular, the Defendants assert the following contentions: (i) the Plaintiffs lack standing to maintain this action; (ii) the Plaintiffs' claims are barred by the

preclusive effect of orders rendered in the related bankruptcy proceeding; (iii) the complaint lacks enough plausible facts to state a claim under any of the Plaintiffs' chosen theories of recovery; (iv) Plaintiffs' claims based on breach of fiduciary duty and tortious interference are time-barred; (v) the Plaintiffs' claim for damages is impermissibly speculative; and (vi) the Plaintiffs claim based on fraud is not pled with particularity and, in any event, lacks sufficient factual support to plausibly state a claim for relief.

For the reasons that follow, the Court grants the Defendants' motion to dismiss.

## II.     Discussion

### A.     The Applicable Legal Standard

#### 1.     The Standard for Dismissal under Fed. R. Civ. P. 12(b)(6)

Under Fed. R. Civ. P. 8(a)(2), a pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."    The pleading standard announced in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 677-78 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' "  Id. at 678  (quoting Twombly, 550 U.S. at 555).

Rather, to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state claim for relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 557. The "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 557.

Relevant here, "'[r]es judicata challenges may properly be raised via a motion to dismiss for failure to state a claim under Rule 12(b)(6).'" Harte v. Iberia Airlines, 02-cv-3624, 2002 U.S. Dist. LEXIS 14964, at *4 (S.D.N.Y. Aug. 13, 2002) (quoting Thompson v. County of Franklin,15 F.3d 245, 253 (2d Cir. 1994)).

## B. As to Whether the Plaintiffs' Claims are Precluded by the Res Judicata Effect of the Final Orders of the Bankruptcy Court

The Defendants contend that this action is precluded by three final orders of the Bankruptcy Court (the "Bankruptcy Orders"), namely: (i) the so-called "Sale Procedures Order", which is a June 28, 2010 order of United States Bankruptcy Judge Dorothy T. Eisenberg, approving procedures for the eventual sale of Brown Publishing's assets; (ii) the so-called "Sale Approval Order", which is an August 11, 2010 order of Judge Eisenberg purportedly authorizing the sale of Brown Publishing's assets; and (iii) the so-called "Confirmation Order", which is a June 16, 2011 order by Judge Eisenberg confirming the Third Amended Joint Chapter 11 Plan of Liquidation of the Brown Publishing Company, Brown Media Holdings Company, and their Respective Debtor Affiliates and Subsidiaries (the "Plan").

The Court notes that complete copies of the Sale Procedures Order and the Confirmation Order are attached as exhibits "L" and "J" to the January 14, 2015

declaration of Anthony C. Acampora, Esq. (the "Acampora Decl."), which was submitted in support of this motion. However, only two one-page excerpts of the Sale Approval Order are in the record. <u>See</u> Acampora Decl., Ex "F" & "G."

The Defendants assert that the complaint in this action "collaterally attack[s] the Bankruptcy Court's prior approval of the manner in which Defendants, on [Brown Publishing's] behalf, managed the seminal event in [Brown Publishing's] bankruptcy cases," namely, "the Auction." <u>See</u> Defs. Memo of Law at 19. In this regard, the Defendants assert that the "Plaintiffs seek to revisit issues regarding Defendants' conduct in connection with the Auction and sale process upon which the Bankruptcy Court has previously and conclusively ruled . . ." <u>Id.</u> at 18-19. Thus, according to the Defendants, the instant action constitutes a challenge to the Bankruptcy Court's orders, "which could have been raised during the" underlying bankruptcy proceedings. <u>Id.</u> at 18-19.

In opposition, the Plaintiffs contend that orders entered in contested bankruptcy matters do not preclude issues that require adjudication by a subsequent adversary proceeding. Further, the Plaintiffs assert that this case does not involve any of the same causes of action that were, or could have been, raised in the bankruptcy proceeding. In this regard, the Plaintiffs assert that they could not have raised the instant claims in the bankruptcy proceeding because: (i) when Guggenheim withdrew its funding commitment, they lacked standing to challenge the sale of Brown Publishing's assets; and (ii) they lacked knowledge of the Defendants' fraudulent scheme during the course of the bankruptcy proceeding.

Further, the Plaintiffs note that this case merely seeks the payment of money damages and does not seek to invalidate the sale of Brown Publishing's assets or otherwise affect the relief afforded by the Bankruptcy Court.

Initially, it is well-settled that "[t]he materials a court may consider when deciding a motion to dismiss under Rule 12(b)(6) are limited." Armand v. Osbourne, 11-cv-4182, 2014 U.S. Dist. LEXIS 23911, at *9 (E.D.N.Y. Feb. 24, 2014). In fact, "a court considering a . . . motion to dismiss for failure to state a claim generally may not consult evidence outside the pleadings." Vailette v. Lindsay, 11-cv-3610, 2014 U.S. Dist. LEXIS 114701, at *8 (E.D.N.Y. Aug. 18, 2014). Rather, in adjudicating such a motion, the Court may only consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

Environmental Servs., 7 F. Supp. 2d at 270 (quoting In re Merrill Lynch & Co., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003)); see In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (same), aff'd on other grounds, Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005), cert. denied, 546 U.S. 935, 126 S. Ct. 421, 163 L. Ed. 2d 321 (2005).

" 'Federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings offered in conjunction

with a Rule 12(b)(6) motion.'" <u>Environmental Servs.</u>, 7 F. Supp. 2d at 270 (quoting

<u>Carione v. United States</u>, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005)).

Applying these principles, in its discretion, the Court finds that the

Bankruptcy Orders may properly be considered in adjudicating the instant motion

to dismiss. In the Court's view, these documents represent the kind of public

records of which it may appropriately take judicial notice under Rule 12(d). <u>See</u> <u>In</u>

<u>re Mirena IUD Prods. Liab. Litig.</u>, 29 F. Supp. 3d 345 (S.D.N.Y. 2014) (noting that

"[t]he Court may [ ] rely on matters of public record, such as judicial documents and

official court records, in deciding whether to dismiss a complaint" (citing <u>Pani v.</u>

<u>Empire Blue Cross Blue Shield</u>, 152 F.3d 67, 75 (2d Cir. 1998))); <u>Lastra v. Barnes &</u>

<u>Noble Bookstore</u>, 11-cv-2173, 2011 U.S. Dist. LEXIS 150112, at *17-*18 n.2

(S.D.N.Y. Jan. 3, 2012) (noting that "'a court may take judicial notice of public

records and of admissions in pleadings and other documents in the public record

filed by a party in other judicial proceedings that contradict the party's factual

assertions in a subsequent action'" (quoting <u>Munno v. Town of Orangetown</u>, 391

F. Supp. 2d 263, 268-69 (S.D.N.Y. 2005)), <u>aff'd</u>, 523 F. App'x 32 (2d Cir. 2013).

Moving to the merits of the Defendants' contentions, "[i]n determining

whether res judicata is a bar, a court must determine whether (1) the prior decision

was a final judgment on the merits; (2) the litigants were the same parties, or their

privies; (3) the prior court was of competent jurisdiction; and (4) the causes of action

were the same." <u>Corbett v. MacDonald Moving & Storage, Inc.</u>, 92-cv-5092, 1996

U.S. Dist. LEXIS 22835, at *18 (E.D.N.Y. Sept. 26, 1996) (citing <u>In re Teltronics,</u>

Inc., 762 F.2d 185, 190 (2d Cir. 1985)).  Central to this determination is "whether an independent judgment in a separate proceeding would impair or destroy rights or interests established by, in this case, the bankruptcy decree[s]."  Id. (citing Sure-Snap Corp. v. State Street Bank and Trust Co., 948 F.2d 869, 872 (2d Cir. 1991)).

Further, "[r]es judicata bars re-litigation of not only those claims brought in the prior proceeding, but also of those that could have been brought."  Id. at *22 (citing Sure-Snap, 948 F.2d at 873); see Celli v. First Nat'l Bank, 460 F.3d 289, 292 (2d Cir. 2006) (noting that the "critical question for res judicata purposes is whether the party could or should have asserted the claim in the prior proceeding" (internal quotation marks and citation omitted)).  In this regard, " '[a] first judgment will generally have preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is[,] where the same evidence is needed to support both claims, and where the facts essential to the second were present in the first.' "  EDP Med. Computer Sys., Inc. v. United States, 03-cv-3619, 2005 U.S. Dist. LEXIS 29062, at *21 (E.D.N.Y. Nov. 22, 2005) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1463-64 (2d Cir. 1996)) aff'd, 480 F.3d 621 (2d Cir. 2007).

"The burden is on the party seeking to invoke res judicata to prove that the doctrine bars the second action."  Computer Assocs. Int'l v. Altai, Inc., 126 F.3d 365, 369 (2d Cir. 1997) (citing Thomas v. New York City, 814 F. Supp. 1139, 1148 (E.D.N.Y. 1993)), cert. denied, 523 U.S. 1106, 118 S. Ct. 1676, 140 L. Ed. 2d 814 (1998).

In this case, the parties do not appear to dispute that the Bankruptcy Orders constitute final judgments on the merits; that the litigants in the bankruptcy proceeding were the same as the parties in this case; and that the Bankruptcy Court is a court of competent jurisdiction. Rather, the parties only dispute the fourth element of the res judicata standard, namely, whether the causes of action were the same, and if not, whether the claims asserted by the Plaintiffs in this action could have been brought in the prior proceeding. In the Court's view, settled principles of claim preclusion require dismissal of the Plaintiffs' complaint.

Initially, the Court has had occasion to review the Bankruptcy Orders and finds that none of them directly or sufficiently addresses the causes of action asserted in this case. In this regard, there is no indication that KLG's allegedly improper dual representation, the issue which dominates the entire complaint in this action, was raised at the time of the Bankruptcy Orders. In fact, the Court takes judicial notice of the fact, which was determined in a prior order of this Court, that Roy did not raise the potential conflict of interest to the Bankruptcy Court until approximately one year *after* the issuance of the Confirmation Order, when he moved to disqualify KLG as counsel for the Liquidating Trust. See <u>KLG Gates LLP v. Brown</u>, 506 B.R. 177, 185 (E.D.N.Y. 2014) (Spatt, J.). Thus, contrary to the Defendants' contentions, it cannot be said that this issue was fully and fairly litigated at the time of the Bankruptcy Orders.

However, a closer question is presented with respect to whether the Plaintiffs *could have* asserted the issues that they raise in this case before the Bankruptcy

Court.  As mentioned above, "[a] judgment is 'res judicata not only as to what was pleaded, but also as to what could have been pleaded.  New legal theories do not [automatically] amount to a new cause of action so as to defeat the application of the principle of res judicata.' " <u>Sure-Snap</u>, 128 B.R. at 889 (quoting <u>In re Teltronics</u>, 762 F.2d at 193); <u>see</u> <u>Waldman v. Village of Kiryas Joel</u>, 207 F.3d 105, 110 (2d Cir. 2000) ("[A] plaintiff cannot avoid the effects of res judicata by 'splitting' his claim into various suits, based on different legal theories" (quoting <u>Woods v. Dunlop Tire Corp.</u>, 972 F.2d 36, 39 (2d Cir. 1992)).

In this regard, "[t]he Second Circuit has explained that 'the circumstance that several operative facts may be common to successive actions between the same parties' by itself is insufficient to qualify them as the same cause of action." <u>Sure-Snap</u>, 128 B.R. at 890 (quoting <u>N.L.R.B. v. United Technologies Corp.</u>, 706 F.2d 1254, 1259 (2d Cir. 1983)).  Indeed, "[b]ecause a bankruptcy case is fundamentally different from the typical civil action, comparison of a bankruptcy proceeding with another proceeding is not susceptible to the standard res judicata analysis.  Rather, the Court must scrutinize the totality of the circumstances in each action and then determine whether there is identity of causes of action." <u>HSBC Bank USA, N.A. v. Adelphia Communs. Corp.</u>, 07-cv-553A, 2009 U.S. Dist. LEXIS 10675, at *31-*32 (W.D.N.Y. Feb. 12, 2009) (quoting <u>NLRB</u>, 706 F.2d at 1260) (emphasis supplied).

At the same time, however, "the facts essential to the barred second suit need not be the same as the facts that were necessary to the first suit.  It is instead enough that 'the facts *essential to the second* were [already] present in the first.' "

Waldman, 207 F.3d at 110-11 (quoting Altai, Inc., 126 F.3d at 369) (emphasis in original).

In the Court's view, considering the totality of the circumstances, the complaint in this case is a "thinly disguised collateral attack on the" Bankruptcy Orders. See In re Met-L-Wood Corp., 861 F.2d 1012 (7th Cir. 1988) (affirming dismissal of a fraud case that, although not seeking to reverse a § 363 bankruptcy sale, sought heavy damages against the participants to the transaction that, in the Court of Appeals' opinion, constituted a collateral attack on the validity of the bankruptcy court's judgment), cert. denied, 490 U.S. 1006, 109 S. Ct. 1642, 104 L. Ed. 2d 157 (1989).

Indeed, other courts have held that actions "seek[ing] damages for conduct permitted by, and directly resulting from" court-approved transactions represent "the very essence of an impermissible collateral attack." In re Daewoo Motor Co., Ltd. Dealership Litig., MDL-1510, 2005 U.S. Dist. LEXIS 43197, at *35 (M.D. Fla. Jan. 6, 2005) (collecting cases).

In this case, the Plaintiffs have denominated their causes of action as tort claims, and assert that they do not seek to delegitimize the Bankruptcy Orders. However, the fact remains that they seek to challenge the result of the § 363 sale by placing themselves in the same position as if they had been the successful bidders for Brown Publishing's assets. This much is clear from the Plaintiffs' prayer for relief, which identifies the remediable injury as their inability to purchase the subject assets, and asserts a demand for compensation to restore them to "where

[they] would have been financially with respect to these assets had they succeeded" at the auction. See Compl. ¶¶ 70-71. Thus, the fact that the Plaintiffs choose in this action not to formally seek rescission of the § 363 sale is immaterial. In the Court's view, and as the Defendants contend, there can be little doubt that the practical effect of the relief sought here would be to call into question the integrity of "Judge Eisenberg's prior, final determinations regarding the propriety of the Auction and Defendants' management of the Debtors' bankruptcy cases." Defs. Reply Memo at 12. Of course, such a result "would impair, destroy, challenge, or invalidate the enforceability or effectiveness of the original reorganization plan," whether the sale is unwound or not.

Furthermore, in the Court's view, the reasons supplied by the Plaintiffs for not being able to raise their claims in the bankruptcy proceeding are unavailing. In a single footnote addressing this crucial aspect of the relevant legal standard, the Plaintiffs state as follows:

> Even if the law required Plaintiffs to raise any issue they "could have" raised prior to the Sale Orders (it did not), Brown Media had already lost its financing and accordingly would have lacked standing to challenge the September 2010 Sales Orders. See In re Colony Hill Assocs., 111 F.3d 269 (2d Cir. 1997) (limiting standing to challenge sale orders to actual unsuccessful bidders complaining about fraudulent collusion among the participants or similarly inequitable conduct). And in any event Plaintiff had not learned about the investment banker's accounting of the role KLG played in using the illegal foreclosure action to improperly value Brown Media's bid. Compl. ¶ 59. So both as a matter of standing and their limited contemporaneous knowledge, Plaintiffs could not have challenged the Sales Orders.

See Pl. Opp. Memo at 14.

The Court takes issue with this argument. Initially, the Plaintiffs appear to contend that standing to challenge bankruptcy sale orders is limited "to actual unsuccessful bidders complaining about fraudulent collusion among the participants or similarly inequitable conduct." However, the record demonstrates that the Plaintiffs *are* "unsuccessful bidders" who, in this case, are "complaining about fraudulent collusion among the [sale] participants or similarly inequitable conduct." Indeed, it is undisputed that the Plaintiffs participated in a 23-hour auction for Brown Publishing's assets, but were eventually outbid by the PNC Bank Group. In addition, the Plaintiffs attribute their inability to successfully acquire those assets to the fraudulent conduct of the Defendants. Thus, by their own reasoning, the Plaintiffs did not lack standing.

In any event, Colony Hill does not support this position. In that case, the Second Circuit considered whether a disqualified bidder, who was wholly denied the opportunity to place a bid at a bankruptcy sale, had standing to appeal the determinations of the bankruptcy court. The putative bidder in that case alleged, among other things, that the next highest bidder had fraudulently colluded with the other sale participants to exclude him, and therefore was not a good faith purchaser. The Second Circuit reasoned that, to the extent the plaintiff had challenged the "intrinsic fairness" of the transaction, he had standing to appeal.

This Court's reasoning is not altered by the decision in Colony Hill. If anything, this Court is of the view that Colony Hill supports a finding that the Plaintiffs likely could have raised their present causes of action in the bankruptcy

proceeding. Similar to the plaintiff in <u>Colony Hill</u>, the Plaintiffs in this case allege that fraudulent collusion between the debtors' counsel, the prevailing bidders, and a supposedly independent director of the debtor, is what caused their bid to be artificially devalued and, ultimately, is what prevented them from purchasing Brown Publishing's assets. In addition, unlike the plaintiff in <u>Colony Hill</u>, these Plaintiffs actively participated in a lengthy, although unsuccessful, bidding process. Therefore, to the extent the Plaintiffs' allegations against the Defendants go to the intrinsic fairness of the auction, they likely would have had standing under the rule in <u>Colony Hill</u> to assert their present claims. At a minimum, it is clear to this Court that <u>Colony Hill</u> would not, as the Plaintiffs suggest, have operated as a bar to their standing.

Further, the Plaintiffs appear to contend that they are not "unsuccessful bidders," as that term is used in <u>Colony Hill</u>, because Guggenheim withdrew as a funding source before the Managers could close on a deal. However, <u>Capitol Hill</u> does not stand for that proposition and the Plaintiff has not pointed to any other supporting authority.

Also, in the absence of any supporting factual details, the Plaintiffs' bare assertion that they "had not learned about the investment banker's accounting of the role KLG played in using the illegal foreclosure action to improperly value Brown Media's bid" is insufficient to defeat the present challenge on res judicata grounds. In this regard, the Plaintiffs cite paragraph 59 of the complaint, which alleges as follows:

> On information and belief, based on conversations with the Debtors'
> lead investment banker at the time (Sam Mitchell), KLG determined
> prior to the auction that assumption of the CRJ leases would not be
> accorded any value in the auction process on the theory that
> foreclosure would have the effect of terminating the Debtors' leases,
> making assumption impossible.

Compl. ¶ 59.

In the Court's view, this allegation does not buttress the Plaintiffs' contention that it lacked sufficient contemporaneous knowledge of the fraudulent scheme to have raised their present claims in the Bankruptcy Court. Even assuming the truth of this allegation – namely, that KLG went into the auction knowing that the Managers' stalking horse bid would be undervalued – it provides no indication whatsoever as to when the Plaintiffs obtained that knowledge.

In reaching its conclusion the Court takes note of the Plaintiffs' argument that "[i]f every litigation involving non-debtors but conceivably related to a bankruptcy estate had to be completed before a bankruptcy court could approve a sale or confirm a plan, bankruptcy courts would be hampered severely from restructuring debtor-creditor relations." Pl. Opp. Memo at 15. However, contrary to this assertion, the instant action is not merely "conceivably related to a bankruptcy estate." In the Court's view, it is so inextricably linked to the underlying bankruptcy proceeding that the relief the Plaintiffs seek would require this Court to effectively overrule the Bankruptcy Orders. Under the facts and circumstances of this case, any purported policy interest that would be served by allowing the Plaintiffs to maintain this action in the district court is outweighed by the longstanding policy favoring the finality of sale orders issued by bankruptcy

courts.  See In re Lehman Bros. Holdings, Inc., Ch. 11 Case No. 08-13555, 2011 Bankr. LEXIS 629, at *20 (S.D.N.Y. Feb. 22, 2011); see also In re Lawrence, 293 F.3d 615, 621 (2d Cir. 2002) (recognizing that the bankruptcy court is "a forum where finality of court orders is particularly important").

For the reasons set forth above, the Court finds that the Plaintiffs' causes of action in this case could have been raised in the underlying bankruptcy proceeding and are now precluded from being relitigated by the res judicata effect of the Bankruptcy Orders.  Accordingly, to the extent the Defendants seek to dismiss the complaint on this ground, their motion is granted.

Having so held, the Court need not address the Defendants' other contentions at this time.

## III.    Conclusion

For the reasons set forth in this opinion, the Court grants the Defendants' motion to dismiss the Complaint in its entirety.   The Clerk of the Court is directed to close this case.

**SO ORDERED**

Dated: Central Islip, New York            */s/ Arthur D. Spatt*
November 21, 2015                           ARTHUR D. SPATT
                                           United States District Judge