**FILED**
**CLERK**

8:29 am, Feb 28, 2018

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
BROWN MEDIA CORPORATION and ROY E.
BROWN,

                    Plaintiffs,

          -against-

K&L GATES, LLP and EDWARD M. FOX

                  Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
2:15-cv-00676 (ADS)(ARL)

**APPEARANCES:**

**Law Office of Daniel L. Abrams, PLLC**
*Attorney for the Plaintiffs*
31 Penn Plaza
132 West 31st Street, 15th Floor
New York, NY 10001

**Silverman Acampora LLP**
*Attorneys for the Defendants*
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753
      By:    Anthony A. Acampora, Esq., Of Counsel

**SPATT, District Judge**:

      On or about November 27, 2013, Brown Media Corporation ("Brown Media") and Roy E.

Brown ("Roy") (together, the "Plaintiffs") commenced this action against K&L Gates, LLP

("KLG"), Edward M. Fox ("Fox", together with KLG the "Defendants") as well as a recently

dismissed individual defendant, Eric T. Moser.

      The claims in this action arise from a related bankruptcy proceeding. Therefore, the case

was automatically referred to the United States Bankruptcy Court for the Eastern District of New

York (the "Bankruptcy Court").

1

On December 1, 2014, the Defendants filed a motion, pursuant to 28 U.S.C. § 157(d); Federal Rule of Bankruptcy Procedure ("FED. R. BANKR. P.") 5011; and Local Bankruptcy Rule 5011-1, to withdraw the automatic reference and have the case proceed before this Court. On or about January 14, 2015, while that motion was pending, the Defendants filed a second motion, pursuant to FED. R. BANKR. P. 7012 and Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 12(b)(6), to dismiss the complaint.

On January 28, 2015, this Court withdrew the reference from the Bankruptcy Court.

On November 21, 2015, the Court granted the Defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) on the grounds that res judicata bars the Plaintiffs' claims for breach of fiduciary duty, tortious interference and common law fraud ("2015 MTD Decision").

On April 14, 2017, the U.S. Court of Appeals for the Second Circuit vacated the Court's judgment issued pursuant to the 2015 MTD Decision, ruling "[b]ecause the plaintiffs' claims are not of the sort that should have been raised in the underlying bankruptcy proceedings nor do they implicate the validity of the asset sale confirmed in the bankruptcy proceedings, res judicata does not bar them." Docket Entry ("DE") 18 at 2.

On February 8, 2018, Eric T. Moser was voluntarily dismissed from this case.

Presently before the Court is the motion by the Defendants, pursuant to Rule 12(b)(6) to dismiss the Plaintiffs' entire complaint for failure to state a claim upon which relief can be granted. As stated above, the previous decision that dismissed the complaint was vacated and remanded by the Second Circuit for further proceedings consistent with its opinion. For the following reasons, the Defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted in part and denied in part.

# I.  BACKGROUND

Unless otherwise noted, the following salient facts are drawn from the complaint and are construed in favor of the Plaintiffs.

## A.  The Parties

Brown Media is a Delaware Corporation, which was established in March 2010 for the express purpose of acquiring the assets of an entity known as Brown Publishing Company and its affiliated entities (collectively "Brown Publishing").

Roy is an individual residing in Cincinnati, Ohio.  He presently owns the substantial majority of the stock of Brown Media, and is the former CEO, shareholder, and director of Brown Publishing.  Roy is also a part of Brown Publishing's management group.

The defendant, KLG, is an international law firm with approximately forty-five offices located throughout the United States and abroad.  The individual defendant Fox and former defendant Moser are attorneys and former partners at KLG, both of whom currently reside in New York.

## B.  Pre-Bankruptcy

Brown Publishing was a closely-held corporation, which was controlled by Roy; his brother Clancy; his parents, Bud and Joyce; the company's former General Counsel, Joel Dempsey ("Dempsey"); and one Joel Ellingham ("Ellingham") (collectively, the "Managers").  Brown Publishing was a family business, having been founded in 1920 by Roy's grandfather.

At an unspecified time, Brown Publishing received financing from a company known as Windjammer Capital ("Windjammer").  In connection with their financing arrangement, Windjammer allegedly retained an equity option, so that, in the event the loan was not repaid,

Windjammer could exercise its option and force the sale of Brown Publishing's assets to recoup its investment.

For reasons not set forth in the complaint, it is alleged that in late 2008, although not yet in default, the Managers feared that Windjammer might soon exercise its option, which would result in their losing control of Brown Publishing. As a result, the Managers sought legal advice as to how best to maintain control of the enterprise.

In this regard, on or about December 12, 2008, allegedly on behalf of himself and the other Managers, Dempsey contacted Fox and KLG. On that date, Dempsey allegedly supplied Fox and KLG with a document entitled the "Warrant Put Memo" (the "Memo"), which sets forth the issues about which the Managers required legal advice. It is unclear who prepared the Memo, but, as to its contents, the complaint alleges as follows:

> The [ ] Memo ask[ed] KLG for advice related to, inter alia, the legal ramifications of a proposed transaction whereby the Managers create a new LLC and Managers Roy, Dempsey, and Ellingham acquire the assets of Brown Publishing through the new LLC. This proposed transaction was to take place outside of bankruptcy. Legal issues specifically identified in the [ ] Memo included what actions to take, if any, with regards [sic] to Windjammer Capital, possible successor liability related to the proposed transaction, what state would be an advantageous one for incorporation of the new LLC, the tax consequences to the Managers, shareholder disclosure requirements, if any, and other issues pertaining to Brown Publishing's lenders.

*See* Compl. ¶ 20.

It is alleged that the Memo did not contemplate a bankruptcy. In fact, as noted above, Brown Publishing allegedly was not in default of any loans at this time and the Managers were specifically seeking advice about how to retain equity control through a non-bankruptcy transaction.

Allegedly, in response to the Memo, KLG and the individual Defendants provided advice directly to Roy and Dempsey, and billed the Managers for the time spent providing these legal

services. In particular, KLG allegedly advised the Managers on ways to reduce the possibility of so-called successor liability – i.e., the possibility that the new LLC would succeed to the debts and liabilities of Brown Publishing after acquiring its assets. In order to minimize this possibility, KLG allegedly advised Roy not to participate in any eventual transaction, and advised Dempsey to relinquish his shares in an entity known as Brown Media Holdings Company ("Media Holdings"), so that he could become the majority owner of the new LLC.

By March 2009, Brown Publishing was in imminent danger of defaulting on its loan agreement with Windjammer. *See* Compl. ¶ 26. Accordingly, the Managers allegedly took a series of actions to protect Brown Publishing's interests.

In or about March 2009, the Managers allegedly decided to enter into a non-bankruptcy transaction that was structured similarly to the one contemplated by the Defendants in the Memo. The complaint does not provide many supporting details concerning this transaction. From the complaint, the Court cannot determine the parties to the transaction or any of the relevant terms or conditions. However, it is alleged that, in proceeding with this transaction, the Managers followed advice provided by KLG, namely, Roy did not participate and Dempsey relinquished his shares in Media Holdings.

At or about the same time, in March 2009, Windjammer allegedly commenced a lawsuit in Ohio, seeking to invalidate this transaction. Again, the complaint does not provide many supporting details, including the identities of the parties to that action. Nor does it specify whether the action was commenced in state or federal court; or what legal theory Windjammer asserted. Nevertheless, an unidentified Ohio court allegedly approved the transaction and authorized it to move forward.

However, again for reasons not explained in the complaint, at some unspecified time, the Managers allegedly rescinded the March 2009 transaction and, on the advice of KLG, proceeded to bankruptcy.

In this regard, it is alleged that when "[t]he March 2009 transaction did not solve the problems associated with Brown Publishing's debt," Dempsey contacted Fox in early May 2009 for advice. *See* Compl. ¶ 26. From May 2009 to June 2009, KLG allegedly advised the Managers that a sale of Brown Publishing's assets in bankruptcy was their best strategy in order to retain control of the company.

Further, KLG apparently advised Roy and Dempsey, in their individual capacities, to attempt to purchase Brown Publishing's assets through a sale pursuant to Section 363 of the United States Bankruptcy Code, 11 U.S.C. § 363 ("§ 363"), which authorizes the bankruptcy court to conduct a sale of a bankruptcy debtor's assets outside of the ordinary course of business. The complaint alleges that KLG suggested that, if the Managers, acting through the new LLC, purchased Brown Publishing's assets in a sale pursuant to § 363, they "could eliminate successor liability and related tax concerns, and that Roy's family members could potentially join the purchase."

In June 2009, KLG allegedly notified Roy and Dempsey that the firm was interested in representing Brown Publishing in its bankruptcy proceeding. According to the complaint, KLG did not disclose any conflict of interest created by simultaneously (a) representing Brown Publishing in connection with its bankruptcy filing; and (b) advising the Managers in connection with their efforts to retain control of Brown Publishing and acquire its assets. In particular, KLG allegedly did not seek or obtain a waiver from the Managers. Nor did the firm seek consent to represent both the Managers and Brown Publishing.

In July 2009, Brown Publishing allegedly retained KLG as counsel. After being so retained, KLG allegedly continued to advocate for a sale of Brown Publishing's assets to the Managers by way of a sale in bankruptcy pursuant to § 363, despite the Managers' expressed preference for an out-of-court restructuring.  In this regard, KLG allegedly began preparing a strategy by which the Managers would maximize their odds of prevailing in a public auction for the company's assets. In particular, in August 2009, KLG and Dempsey began preparing a "stalking horse asset purchase agreement." (the "APA")

Although not described in the complaint, the Court will take judicial notice of the basic concept of a stalking horse bid in bankruptcy.  As one court has noted:

> A stalking horse bidder in a bankruptcy proceeding makes an initial bid to purchase the assets of a debtor on the theory that the initial bidder's "initial research, due diligence, and subsequent bid may encourage later bidders." *In re 310 Associates*, 346 F.3d 31, 34 (2d Cir. 2003). Stalking horse bidders often contract to receive a "break-up fee" compensating it for its bidding activities should a higher bid ultimately emerge and win an eventual asset auction. *See In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992).

*In re MSR Resort Golf Course LLC*, 13-cv-2448, 2014 WL 67364, at *2 n.3 (S.D.N.Y. Jan. 7, 2014).  As the Second Circuit has succinctly stated: "A 'stalking horse' contract is a first, favorable bid strategically solicited by the bankrupt company to prevent low-ball offers."  *In re WestPoint Stevens, Inc.*, 600 F.3d 231, 239 n.3 (2d Cir. 2010).

In addition to preparing the APA, KLG also allegedly provided the managers with specific advice concerning, *inter alia*, how much to bid and how to frame their bid so as to maximize the chances that a bankruptcy court would approve an eventual sale.  Further, KLG allegedly provided advice regarding the formation of Brown Media, the entity into which the purchased assets of Brown Publishing would be transferred, namely, the "stalking horse."   KLG also allegedly provided advice as to the benefits of filing the bankruptcy petition in New York.

The complaint alleges that KLG was also active in seeking funding for the Managers' planned purchase of Brown Publishing's assets. In this regard, allegedly, "KLG provided advice to the Managers on the price they should offer, and revised documents drafted by the Managers and sent to potential capital [investors]." Compl. ¶ 35. In addition, Fox allegedly referred the Managers to a friend of his at W&L Ross, a company that acquires other distressed companies, and participated in a conference call with the Managers and individuals at Goldman Sachs.

Allegedly, KLG provided advice to Roy and Dempsey regarding the Managers' efforts to convince Brown Publishing's lenders to finance the Managers' purchase. Among other things, KLG allegedly made extensive edits to a memo prepared by Roy on behalf of himself and the other Managers for this purpose.

It is further alleged that the Managers eventually obtained a funding commitment from Guggenheim Partners ("Guggenheim") to support their purchase offer. The complaint alleges that KLG worked directly with Guggenheim and the Managers to prepare the APA and encouraged Guggenheim to provide a debtor-in-possession loan to infuse capital into Brown Publishing during the Chapter 11 proceeding and preserve the value of its assets.

However, shortly before Brown Publishing's bankruptcy filing, KLG allegedly urged the Managers, and Brown Media, to obtain separate counsel. In particular, Fox allegedly recommended that the Managers retain his friend and former partner, Richard Levy, Esq. The Managers agreed to retain Levy. However, by the time they did so, Brown Media had already been formed for the purpose of placing a stalking horse bid and ultimately acquiring Brown Publishing's assets; and substantive portions of the APA were already negotiated and in place. Around the same time, at KLG's suggestion, Brown Publishing hired Tom Carlson ("Carlson") as an independent director with a mandate to manage the sales process.

## C.  The Bankruptcy Filing

On April 30, 2010, Brown Publishing filed for Chapter 11 bankruptcy in the Eastern District of New York.  The complaint alleges that, "[a]s part of the filing, KLG sought to be and was eventually retained as [Brown Publishing's] Counsel."  Compl. ¶ 45.  Apparently, KLG submitted a disclosure statement (the "Disclosure Statement") in furtherance of the Bankruptcy Court's approval of its retention as counsel for Brown Publishing.  Allegedly, this Disclosure Statement failed to disclose KLG's prior representation of the Managers.  The complaint also alleges that the Disclosure Statement did not disclose "the extent of Defendants' relationships with all of the members of the Bank Group and many other major creditors."  Compl. ¶ 47.  However, the complaint does not define the term "the Bank Group"; does not identify alleged creditors, other than Windjammer; and, in using this term, does not assert any factual allegations regarding KLG's purported relationships with the so-called Bank Group or any other creditors.

After the bankruptcy filing, but shortly before the execution of the APA, Brown Publishing allegedly received a credit bid by an entity referred to in the complaint as "the PNC Bank Group." This term is also not defined and, except as discussed later in this opinion, is not otherwise described in the complaint.  Apparently, the PNC Bank Group's bid was rejected as inferior to the Managers' stalking horse bid.

On May 4, 2010, Brown Publishing, allegedly through Carlson and KLG, executed the APA and sought the Bankruptcy Court's approval of the sale of its assets to the Managers, through Brown Media.  The APA allegedly included an assumption of contracts and leases in the purchase price, which the parties represented to the Bankruptcy Court was "a necessary component of the bargain that [Brown Publishing], in the exercise of [its] sound judgment, ha[d] reached with Brown Media."  Compl. ¶ 49.  The bankruptcy court approved the Managers' bid, and, at the same time,

approved procedures for the eventual sale of Brown Publishing's assets should an auction become necessary.

It also appears that, at some unspecified time, an unsecured creditors committee was formed. Again, the complaint fails to assert any facts relating to this process, but the Court notes that Section 1102 of the Bankruptcy Code provides, in relevant part, that: "as soon as practicable after the order for relief under Chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate." 11 U.S.C. § 1102(a). This committee "shall ordinarily consist of the persons, willing to serve, that hold the seven largest claims against the debtor of the kinds represented on such committee." *Id*. § 1102(b)(1). Among other things, the committee: (i) provides access to information to other unsecured creditors who are not appointed to the committee; (ii) solicits and receives comments from such creditors; and (iii) is subject to court orders that may compel reports and/or disclosures to such creditors. *Id*. § 1102(b)(3)(A)-(C).

On June 1, 2010, KLG apparently requested that Roy "brief" the unsecured creditors committee that was formed pursuant to Brown Publishing's filing. Fox allegedly instructed Roy on how to answer the members' questions concerning his personal interests relative to Brown Publishing. In this regard, the Plaintiffs allege that, although the Managers had retained attorney Levy to represent them, KLG "continued to treat them as clients."

On June 16, 2010, Fox, Roy, and Dempsey met for lunch to discuss issues relating to the bankruptcy proceeding. Allegedly, attorney Levy was not present, nor did Fox suggest that he should be.

**D. The Foreclosure Action**

According to the complaint, CRJ Investments, LLC ("CRJ") was an affiliate by common ownership of Brown Publishing. In particular, CRJ was owned by Roy, Dempsey, and Roy's brother, Clancy. CRJ allegedly owned the real property where Brown Publishing conducted all of its manufacturing and a substantial majority of its profit-generating operations. Apparently, CRJ was also a party to valuable leases with Brown Publishing, although no particular leases are identified. The complaint suggests that, pursuant to the terms of the APA, the Managers would acquire these leases through the ultimate acquisition of Brown Publishing's assets.

It is alleged that CRJ's "sole lender" was Huntington Bank ("Huntington"). Allegedly, Huntington is a member of the PNC Bank Group, which, as described above, had submitted a last-minute competing offer for Brown Publishing's assets. In addition, Huntington is a creditor of Brown Publishing and, importantly, a client of KLG.

The complaint does not specify the type of "lending" in which Huntington engaged, or whether Huntington possessed a security interest in the subject real property owned by CRJ. However, on June 14, 2010, Huntington allegedly filed a foreclosure action against CRJ in an Ohio state court, a move designed to reduce the value of Brown Media's assumption of the CRJ leases. The Plaintiffs assert that Huntington's commencement of the foreclosure action violated the automatic bankruptcy stay pursuant to 11 U.S.C. § 362, and was intended solely to undermine the Managers' efforts to acquire Brown Publishing's assets.

Allegedly, in his capacity as Brown Publishing's General Counsel, Dempsey directed KLG to promptly file a motion to enforce the automatic stay. KLG, through Fox, allegedly agreed to do so, but, according to the complaint, waited until after the auction of Brown Publishing's assets before filing the motion.

It is alleged that KLG's delay in filing the motion to stay the foreclosure action was strategic and designed to benefit Huntington, another of its clients. In particular, the complaint appears to depict the following fraudulent scheme allegedly perpetrated by KLG. The PNC Bank Group, of which Huntington is a part, submitted a competing bid for Brown Publishing's assets. That bid was rejected as being inferior to the Managers' stalking horse bid. However, the PNC Bank Group's bid was deemed inferior, in part, because the APA assigned a substantial value to CRJ's leases with Brown Publishing. In order to make the PNC Bank Group's bid superior to the Managers' stalking horse bid, KLG, with privileged knowledge of the strategic importance to the Managers of the CRJ leases obtained through its representation of the Plaintiffs, allegedly maneuvered to reduce the value of CRJ's leases – a result that could be accomplished if a foreclosure action were pending against it at the time of the action. Thus, the complaint asserts that KLG deliberately refrained from interrupting the foreclosure action so that CRJ's leases would be stripped of their value in the bankruptcy proceeding, and the PNC Bank Group, which included a client of KLG's, would have the prevailing bid for Brown Publishing's assets.

Based on the circumstances outlined above, KLG and Carlson allegedly declared that the PNC Bank Group's bid was the superior bid, thereby necessitating an auction of Brown Publishing's assets.

**E. The Auction**

On July 19, 2010, the auction for Brown Publishing's assets was held at KLG's New York offices.

Having been outbid by the PNC Bank Group for substantially all of Brown Publishing's assets, the Managers allegedly bid on a lesser group of assets than those which were envisioned in the APA. Despite initially being declared the high bidder for those assets, Guggenheim allegedly

withdrew its funding before the Managers could close the transaction. In this regard, the complaint vaguely alleges that Guggenheim's decision to withdraw was influenced by "the Huntington Foreclosure and other problems in the closing process related to the fact that Brown Media was not able to acquire all of the assets envisioned by the APA." Compl. ¶ 64.

The PNC Bank Group was allegedly successful in acquiring most of Brown Publishing's assets.

After the conclusion of the auction, KLG successfully moved in the Huntington foreclosure action to enforce the automatic bankruptcy stay. However, by then, the PNC Bank Group had already acquired Brown Publishing's assets.

## II. DISCUSSION

### A. Standard of Review

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiffs. *See, e.g.*, *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Bold Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free Sch. Dist.*, 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

Under the *Twombly* standard, the Court may only dismiss a complaint if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The Second Circuit has expounded that, after *Twombly,* the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009)).

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to survive a motion to dismiss. FED. R. CIV. P. 8(a)(2). Under Rule 8, a complaint is not required to allege "detailed factual allegations." *Kendall v. Caliber Home Loans, Inc.*, 198 F. Supp. 3d 168, 170 (E.D.N.Y. 2016) (quoting *Twombly*, 550 U.S. at 555). "In ruling on a motion pursuant to FED. R. CIV. P. 12(b)(6), the duty of a court 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (quoting *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998)). The Court "[is] not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

For the Plaintiffs' fraud based claims, those portions of the complaint are subject to Rule 9(b)'s heightened pleading standard. To meet Rule 9(b)'s heightened pleading standard, these elements must be alleged with specificity. Namely, the Plaintiffs must "(1) detail the statements (or omissions) that the plaintiff[s] contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996); *accord Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006); *Shields v. Citytrust Bankcorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

"In short, a plaintiff must set forth the who, what, when, where and how of the alleged fraud." *Telenor E. Invest AS v. Altimo Holdings & Invs. Ltd.*, 567 F. Supp. 2d 432, 441-42 (S.D.N.Y. 2008) (internal citations and quotation marks omitted). "Fraud must be pleaded with particularity while malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Houraney v. Burton & Assoc., P.C.*, 701 F. Supp. 2d 258, 260 (E.D.N.Y. 2010) (citing FED. R. CIV. P. 9(b)).

## B. Standing

### 1. As To Brown Media

The Defendants allege that neither Roy nor Brown Media have standing to sue the Defendants in the instant action. The Court will address the Defendants' claims with respect to each of the Plaintiffs.

For the reasons that follow, the Court concludes that Brown Media does have standing to assert claims against the Defendants. First, the Court must determine whether an attorney-client relationship allegedly existed between Brown Media and the Defendants, which only arises "when one contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services." *Priest v. Hennessy*, 51 N.Y.2d 62, 68-69, 409 N.E.2d 983 (N.Y. 1980) (citing N.Y. C.P.L.R. § 4503(a)).

New York state law explains that "the relationship of an attorney and client is contractual, and the rules governing contract formation determine whether such a relationship has been created." *Hashemi v. Shack*, 609 F. Supp. 391, 393 (S.D.N.Y. 1984); *see also Bingham v. Zolt*, 683 F. Supp. 965, 976 (S.D.N.Y. 1988) ("For an attorney to act as a legal representative, a contract of employment, either express or implied, must exist between the attorney and the party for whom he purports to act." (internal citations omitted)). "Formality is not an essential element in the

employment of an attorney, and since '[t]he initial arrangements for representation are often informal … it is necessary to look at the words and actions of the parties.'" *Hashemi*, 609 F. Supp. at 393 (quoting *People v. Ellis*, 397 N.Y.S.2d 541, 545, 91 Misc. 2d 28 (N.Y. Sup. Ct. 1977)).

At its core, this is a flexible inquiry, with varying factors that are used to determine the existence of an attorney-client relationship. For example, without some form of fee arrangement, there is a presumption that no attorney-client relationship exists. *See Elghanayan v. Iannucci*, 535 N.Y.S.2d 611, 612, 145 A.D.2d 345 (N.Y. App. Div. 1988). "[I]t is the *act* of directly rendering legal advice, services, or assistance … that forms the touchstone of the attorney-client relationship." *Brandman v. Cross & Brown Co. of Fla.*, 479 N.Y.S.2d 435, 437, 125 Misc. 2d 185 (N.Y. Sup. Ct. 1984) (emphasis in original).

Although the complaint does not allege that Brown Media had some sort of fee arrangement with KLG or Fox, the Plaintiffs have alleged enough specific facts in the complaint to support an inference of an attorney-client relationship between Brown Media and the Defendants. The Defendants alleged representation in forming Brown Media and participating in negotiations during the sales process prior to Brown Media's retention of Levy is sufficient under our current pleading regime. To require a law firm or attorney to leave a detailed paper trail in the course of such alleged activities would overburden plaintiffs at the motion to dismiss stage and bastardize the core of the attorney-client relationship.

However, even if there is no attorney-client relationship, "an attorney[ ] may nonetheless owe a fiduciary duty to persons … with whom he deals." *Cohen v. Goodfriend*, 665 F. Supp. 152, 158 (E.D.N.Y. 1987); *see also Jacobson v. Sassower*, 474 N.Y.S.2d 167, 168, 122 Misc. 2d 863 (N.Y. Sup. Ct. 1983), *aff'd*, 483 N.Y.S.2d 711, 107 A.D. 2d 603 (N.Y. App. Div. 1983), *aff'd*, 489 N.E.2d 1283, 66 N.Y.2d 991 (N.Y. 1985). "A fiduciary relationship arises between two persons

when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 12 N.Y.3d 553 (N.Y. 2009) (quoting *EBC I, Inc. v. Goldman Sachs & Co.*, 832 N.E.2d 25, 5 N.Y.3d 11, (N.Y. 2005) (internal quotation marks omitted)). These relationships exhibit greater trust between the parties than those involved in a typical arms-length transaction. *Oddo Asset Mgmt. v. Barclays Bank PLC*, 973 N.E.2d 735, 19 N.Y.3d 584 (N.Y. 2012) (internal citations omitted).

When evaluating whether a fiduciary relationship exists at the motion to dismiss stage, courts examine the totality of the allegations. *See Roni LLC v. Arfa*, 963 N.E.2d 123, 125, 18 N.Y.3d 846 (N.Y. 2011). In New York, the following factors are examined: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmel v. Schafer*, 675 N.E.2d 450, 89 N.Y.2d 257 (N.Y. 1996). This is "necessarily [a] fact specific" inquiry, *Oddo Asset Mgmt*, 19 N.Y.3d at 593, which is typically unsuited for a motion to dismiss. *Dress for Less, Inc. v. CIT Grp. Commercial Servs., Inc.*, No. 01-cv-2669, 2002 WL 31164482, at *16 (S.D.N.Y. Sept. 30, 2002) ("Claims alleging the existence of a fiduciary duty are usually not subject to dismissal in a 12(b)(6) motion." (internal citations omitted)).

The amended complaint contains sufficient allegations to allege a fiduciary relationship between Brown Media and the Defendants. At the time of the formation of Brown Media, the Defendants were allegedly using their position of trust with the Managers to negotiate on behalf of Brown Media, while at the same time, unbeknownst to either the Managers or Brown Media, representing PNC Bank Group, a party with adverse interests.

The Court finds that Brown Media does have standing to bring forth its instant claims against the Defendants.

**2. As To Roy Brown**

The Defendants also allege that Roy does not have standing to sue the defendants as he lacks the ability as a shareholder to sue for injuries that were allegedly suffered by the corporation, Brown Media. For the reasons that follow, the Court concludes that Roy does not have standing to assert claims against the Defendants.

In the Second Circuit, it is well-settled that, in general, individual shareholders lack standing to assert individual claims if "the duty owed to the shareholder[ ] is … indistinguishable from the duty owed to the corporation." *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1121 (2d Cir. 1975); *accord Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988).

However, if a shareholder brings suit alleging a distinct injury that differs from that sustained by the corporation, or a breach of an independent duty owed to the shareholder, then the shareholder will have standing. *See Bankers Trust*, 859 F.2d at 1101; *Ceribelli v. Elghanayan*, 990 F.2d 62, 63-64 (2d Cir. 1993); *Fifty States Mgmt. Corp. v. Niagara Permanent Sav. & Loan Ass'n*, 396 N.Y.S.2d 925, 58 A.D.2d 177 (N.Y. App.Div.1977) (citing *Shapolsky v. Shapolsky*, 53 Misc.2d 830, 279 N.Y.S.2d 747, 751 (N.Y. Sup.Ct.1966), *aff'd*, 28 A.D.2d 513, 282 N.Y.S.2d 163 (N.Y. App.Div.1967)). Put another way, "where the injury to the shareholder results from a violation of a duty owing to the shareholder from the wrongdoer, having its origin in circumstances independent of and extrinsic to the corporate entity, the shareholder has a personal right of action against the wrongdoer." *Fifty States*, 396 N.Y.S.2d at 927 (citing *Shapolsky*, 279 N.Y.S.2d at 751).

At the motion to dismiss stage, "it is the burden of the party who [is seeking standing to sue to] … clearly [ ] allege facts demonstrating that he is a proper party to invoke judicial resolution

18

of the dispute." *Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (internal

citations and quotation marks omitted). However, in the instant action, the Plaintiffs fail to allege

distinct and separate injuries. *See, e.g.*, Compl. ¶¶ 71 ("Plaintiffs have been damages in an amount

to be determined at trial. Damages will include a calculation based in part on the value of the

assets Plaintiffs were unable to purchase due to the Defendants' breach of fiduciary duty, and

where Plaintiffs would have been financially with respect to these assets had they succeeded in

obtaining the assets as contemplated in the APA."), 75 ("Defendants' interference [in the

relationship between the Plaintiffs and the Debtors] has caused Plaintiffs to suffer damages in an

amount to be determined at trial."), 82 ("Defendants' fraud has caused Plaintiffs to suffer damages

in an amount to be determined at trial.").

It is not the Court's responsibility to "infer[ standing] argumentatively from averments in

the pleadings;" the Plaintiffs were required to plead it into the complaint. *Thompson*, 15 F.3d at

249 (internal citations and quotation marks omitted). Moreover, even if that were not the case, the

Court would be unable to do so, as the only injury that the Plaintiffs claim in their pleadings, which

is principally the loss of the value of the Debtors' assets, impacts the corporation, Brown Media,

as well as its shareholders, among them Roy, equally. *See Strougo v. Bassini*, 282 F.3d 162, 169

(2d Cir. 2002) ("[S]hareholder injuries deriving from diminution of corporate assets [are] an injury

quintessentially remediable by shareholders only through a derivative action."). There are no

allegations in the complaint of Roy suffering any distinct injuries from those that were allegedly

borne by Brown Media.

The Plaintiffs are incorrect in their claim that *Schnabel v. Sullivan*, No. 04-cv-5076, 2008

WL 4560090 (E.D.N.Y. Sept. 29, 2008) and its progeny saves Roy. Although Judge Mauskopf

ruled that the existence of an independent duty owed by the defendant to the shareholder prevented

dismissal due to a lack of standing, she also noted that a shareholder may only sue for "damages caused by the defendant's negligence which resulted in *injury that is personal to the shareholder and independent of the damage caused to the corporation*." *Id*. at *3 (quoting *Lawrence Ins. Grp., Inc. v. KPMG Peat Marwick L.L.P.*, 5 A.D.3d 918,773 N.Y.S.2d 164, 166 (N.Y. Supp. Ct. 2004) (internal quotation marks omitted)) (emphasis added). As the Plaintiffs fail to plead damage that is independent of that allegedly suffered by the corporation, Brown Media, *Schnabel* is inapplicable to the facts at bar.

As Roy has failed to allege an injury sustained to him that is separate and distinct from that of the corporation, his claims may not be raised in the instant suit. For the foregoing reasons, the action is dismissed as to Roy.

## C. The Statute of Limitations

The Defendants argue that the Plaintiffs fail to state claims for breach of fiduciary duty and tortious interference upon which relief can be granted because these claims are time-barred. The Court finds no merit in this argument.

The parties agree that the applicable statute of limitations for the Plaintiffs' claims of breach of fiduciary duty and tortious interference in New York State is three years. Irrespective of the parties' positions, the Court will nevertheless address the applicable time periods under New York law.

In a diversity case, the law of the State of New York governs the statute of limitations, accrual, as well as any applicable tolling. *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 709 (2d Cir. 2002); *Personis v. Oiler*, 889 F.2d 424, 426 (2d Cir. 1989). Under New York law, a claim for tortious interference with prospective business relations' three-year statute of limitations begins to run from the date of the injury. N.Y. C.P.L.R. § 214; *Pasqualini v. Mortgageit, Inc.*, 498 F. Supp.

2d 659, 668 (S.D.N.Y. 2007). Both parties agree that the auction for the Debtors' assets occurred on July 19, 2010. Since the Plaintiffs are alleging that the Defendants' actions caused them to fail in their attempt to acquire the Debtors' assets, i.e. lose the value of those potential investments, the statute of limitations for the Plaintiffs' claim of tortious interference with prospective business relations began to run on July 19, 2010.

Under New York law, a claim for breach of fiduciary duty which seeks only monetary damages typically has a three year statute of limitations. N.Y. C.P.L.R. § 214; *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 164, 307 A.D.2d 113 (N.Y. App. Div. 2003). *See also Carlingford Ctr. Point Assocs. v. MR Realty Assocs.*, 772 N.Y.S.2d 273, 274, 4 A.D.3d 179-80 (N.Y. App. Div. 2004) ("A breach of fiduciary duty claim is governed by either a three-year or six-year limitation period, depending on the nature of the relief sought. The shorter time period applies where monetary relief is sought, the longer where the relief sought is equitable in nature." (internal citations omitted)). The statute of limitations period generally begins to run when the cause of action accrues. N.Y. C.P.L.R. § 203(a); *see, e.g.*, *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007).

However, a breach of fiduciary duty claim that sounds in constructive fraud has a statute of limitations of six years. *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993). A breach of fiduciary duty claim predicated on allegations of a failure to disclose information sounds in constructive fraud. *Balta v. Ayco Co.*, 626 F. Supp. 2d 347, 358 (W.D.N.Y. 2009) (internal citations omitted).

In the instant case, Plaintiffs' breach of fiduciary duty claims are based on the Defendants' failure to disclose information. These allegations are not merely incidental to the breach of fiduciary duty claims, but represent the core of the Plaintiffs' breach of fiduciary duty claim. *Kaufman*, 760 N.Y.S.2d at 165 ("In our view, [the plaintiff's] allegations are not merely incidental

to the breach of fiduciary duty claim, and, instead, state a valid cause of action for actual fraud." (internal citations omitted)).  As a result, the instant breach of fiduciary duty claim is subject to a six-year statute of limitations period, even though the Plaintiffs demand only money damages.  As this action was filed within six years of the alleged breach, this claim is timely brought.

Regardless of the statute of limitations periods applicable to the fiduciary duty claim, the Plaintiffs' claims as to breach of fiduciary duty and tortious interference are timely.  On July 12, 2013, the Plaintiffs commenced an action in the Supreme Court, Westchester County.  As of this date, neither statute of limitations period had expired.  This case was ultimately dismissed *sua sponte* by the state court due to lack of subject matter jurisdiction.  On November 27, 2013, the instant lawsuit was commenced in the Bankruptcy Court.  The Defendants argue that November 27, 2013 is the proper date for statute of limitations purposes, which, according to the Plaintiffs, was past the statute of limitations period for both claims.  The Court finds that this position is contradicted by N.Y. C.P.L.R. § 205.

In pertinent part, C.P.L.R. § 205 states:

If an action is timely commenced and is terminated in any other manner than by a voluntary discontinuance, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff … may commence a new action upon the same transaction … within six months after the termination provided that the new action would have been timely commenced at the time of commencement of the prior action.

N.Y. C.P.L.R. § 205(a).  This statute is applicable to those cases that have "suffered dismissals of a generally technical type."  *Winston v. Freshwater Wetlands Appeals Bd.*, 646 N.Y.S.2d 565, 566, 224 A.D.2d 160 (N.Y. App. Div. 1996).  "It is well settled in New York that dismissal of an action for lack of subject matter jurisdiction may be one of the bases for invoking § 205(a)."  *Diffley v. Allied-Signal, Inc.*, 921 F.2d 421, 424 (2d Cir. 1990); *see, e.g., Dyer v. Cahan*, 540 N.Y.S.2d 785,

785–86, 150 A.D.2d 172 (N.Y. App. Div. 1989). As N.Y. C.P.L.R. § 205 applies, the July 2013 date applies and the applicable claims were timely.

The Defendants also contend that § 205 should not apply because the Plaintiffs acted in bad faith in commencing the prior action. This contention is contrary to the purpose of § 205 and the law of the State of New York. First, the purpose of § 205 is to "remedy [ ] what might otherwise be the harsh consequence of applying a limitations period where the defending party has had timely notice of the action … [I]t has long been understood that that purpose is not to be frittered away by any narrow construction." *Goldstein v. New York State Urban Dev. Corp.*, 921 N.E.2d 164, 13 N.Y.3d 511 (N.Y. 2009) (internal citations and quotation marks omitted). Second, the Plaintiffs' reference to *Gaines v. City of New York*, 109 N.E. 594, 215 N.Y. 522 (N.Y. 1915) is misplaced. In *Gaines*, a decision that is over a century old, the court noted in dicta that "[t]he rule of [C.P.L.R. 205(a)] was enacted … to save the rights of the honest rather than the fraudulent suitor." 215 N.Y. at 533. The Court declines to rely on such a case. Further, even if there was jurisprudence in the last one hundred years to support the Defendants' position, the Defendants have not provided any evidence that the Plaintiffs' actions were taken in bad faith.

Accordingly, both the breach of fiduciary duty and the tortious interference claims are timely.

## D.  The Breach Of Fiduciary Duty Claim

### 1.  Duty

"In order to sustain a claim of breach of fiduciary duty under New York law, [a plaintiff] must prove the existence of a fiduciary relationship, misconduct by [a defendant], and damages directly caused by [a defendant's] misconduct." *Margrabe v. Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (internal citations and quotation marks omitted). Such a

relationship exists "between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676, 132 A.D.2d 162 (N.Y. App. Div. 1987) (internal citations omitted). In New York, fiduciary relationships "exhibit the characteristics of de facto control and dominance." *Doe v. Roman Catholic Diocese of Rochester*, 907 N.E.2d 683, 683, 12 N.Y.3d 764 (N.Y. 2009) (internal citations and quotation marks omitted). "[A] cause of action based upon breach of fiduciary duty rests not on the violation of a generalized professional standard, but on the abuse of a particularized relationship of trust." *Wende C. v. United Methodist Church*, 776 N.Y.S.2d 390, 397, 6 A.D.3d 1047 (N.Y. App. Div. 2004).

This inquiry cannot be made "by recourse to rigid formulas." *Scott v. Dime Sav. Bank of N.Y., FSB*, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995). Rather, "New York courts conduct a fact-specific inquiry into whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Facella v. Fed'n of Jewish Philanthropies of New York, Inc.*, No. 98-cv-3146, 2004 WL 1700616, at *6 (S.D.N.Y. July 30, 2004) (internal citations omitted); *accord St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 166 (E.D.N.Y. 2010) ("[D]etermining the existence of a fiduciary relationship requires a fact-specific inquiry."). Therefore, typically "[a] claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)." *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006).

In the instant case, the complaint adequately alleges the existence of a fiduciary relationship between both Plaintiffs and the Defendants, whereby the Defendants "exercised de facto control and dominance," *Doe*, 907 N.E.2d at 683, with regard to the Plaintiffs. Beginning in 2008, the Defendants allegedly began advising the Managers in regards to the Memo. This

relationship continued throughout 2009 and into 2010 and included successor liability concerns and possible transaction structures regarding the March 2009 transaction, and advice on a § 363 sale as well extensive assistance on obtaining funding on behalf of Roy and the rest of the Managers to bid on the Debtors' assets. A portion of this advice was provided directly to Roy. KLG billed the Managers for the time devoted to providing these legal services. The complaint further alleges that the Defendants were provided confidential information during the course of these activities.

As to Brown Media, as discussed above, at the time of its formation, the Defendants were alleged to have used their position of trust with the Managers to negotiate on behalf of Brown Media, while at the same time, unbeknownst to either the Managers or Brown Media, represented PNC Bank Group, a party with adverse interests. KLG and Fox allegedly assisted in the formation of Brown Media, and supported the Managers, including Roy, in their effort to convince Brown Publishing's lenders to finance Brown Media's acquisition of the Debtor's assets.

At the motion to dismiss stage, accepting these allegations as true and drawing all reasonable inferences in favor of the Plaintiffs, the Court concludes that the Plaintiffs have adequately pled the existence of a fiduciary relationship between the Plaintiffs and the Defendants.

## 2. Breach

Further, the Court concludes that the Plaintiffs sufficiently plead that the Defendants breached their fiduciary duties to the Plaintiffs. The complaint alleges that the Defendants used the confidential information obtained from the Plaintiffs and the rest of the Managers to "tilt[ ] the bidding process away from the Plaintiffs and towards [the Defendants'] bank clients who successfully competed with Plaintiffs [during the auction bidding process], and using Plaintiffs' confidential information to help their other clients." Compl. ¶ 69. The Plaintiffs further claim that

25

the Defendants "deliberately delayed filing a motion to enforce the [Bankruptcy Court's] automatic stay until after the Bankruptcy auction, knowing full well that the illegal foreclosure action [initiated by the Defendants' clients] undermined the Managers' bid." *Id*.

All of these alleged actions constitute a breach of the Defendants' fiduciary duties to Roy and Brown Media. *See Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576, 73 N.Y.2d 461 (N.Y. 1989) (holding that the laws enforcing fiduciary duties "bar[ ] not only blatant self-dealing, but also require[e] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty" (internal citations omitted)). As such, the Court finds that the Plaintiffs sufficiently pled that the Defendants breached their fiduciary duty.

### 3. Causation & Damages

The Court further concludes that the Plaintiffs have adequately alleged that the Defendants' breaches of their fiduciary duty caused the Plaintiffs to incur damages related to their failed attempt to obtain the Debtors' assets. *See Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("This is nothing more than application of the principle that, once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer."). Any doubt or ambiguity alleged by the Defendants with respect to the Plaintiffs' causation or damages should be construed in favor of the Plaintiffs, given the nature of the Defendants' alleged breach. *See Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994) (collecting cases) ("[B]reaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages.").

Accordingly, the Defendants' motion to dismiss the Plaintiffs' claim for breach of fiduciary duty is denied.

### E. The Tortious Interference With Prospective Economic Advantage Claim

A claim of tortious interference with prospective economic advantage is identical to a claim of tortious interference with a business relationship. *See Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., LLC*, 455 F. App'x 102, 105 (2d Cir. 2012) (summary order); *RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 196 (S.D.N.Y. 2011). In New York State, to allege a tortious interference with prospective economic advantage claim, a plaintiff must allege that: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., LLC v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) (internal citations omitted). "[M]ere suspicions are inadequate to support a claim for tortious interference with [prospective economic advantage]." *Scutti Enters. v. Park Place Entm't Corp.*, 322 F.3d 211, 217 (2d Cir. 2003) (citing *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000)).

The Defendants do not appear to dispute that there was a business relationship between the Managers and the Debtors, which is alleged in the complaint. *See* Compl. ¶ 73 ("The Managers' stalking horse bid as codified in the APA was a business relationship between the Managers and Debtors."). As such, it is undisputed, for the purposes of this motion, that Roy and the Debtors had a business relationship.

However, the Plaintiffs fail to plead that Brown Media had an ongoing business relationship with the debtors at the time of the alleged issue. At the motion to dismiss stage, a plaintiff "must specify some particular, *existing* business relationship through which plaintiff would have done business but for the allegedly tortious behavior." *Indus. Tech Ventures LP v. Pleasant T. Rowland Revocable Trust*, 688 F. Supp. 2d 229, 244 (W.D.N.Y. 2010) (citing *Minn.*

*Mining and Mfg. Co. v. Graham-Field, Inc.*, No. 96-cv-3839, 1997 WL 166497, at *7 (S.D.N.Y. Apr. 9, 1997)) (emphasis added). Here, the complaint fails to identify any existing business relationship between Brown Media and a third party with which the Defendants interfered. *See* Compl. ¶¶ 72-75. For this reason alone, Brown Media's claim fails.

Further, the Plaintiffs fail to claim *any* specific business relationship between Brown Media and a third party. In New York, the complaint must plead "interference with a specific identified business relationship with a third party." *Camp Summit of Summitville, Inc. v. Visinski*, No. 06-cv-4994, 2007 WL 1152894, at *14 (S.D.N.Y. Apr. 16, 2007) (internal citations omitted). Without more than vague allegations regarding relationships between Brown Media and third parties, the claim fails to withstand a motion to dismiss. Accordingly, the Plaintiffs' tortious interference claim as it pertains to Brown Media is dismissed.

Although the Court determined that Roy lacks the requisite standing to pursue this claim, the Court will nevertheless address the third element of the tortious interference claim components as it pertain to Roy.

To succeed in pleading the third element of tortious interference, the Plaintiffs must show "a greater degree of culpable conduct than would be required to state a claim for tortious interference with contract." *In re Nicholas*, 457 B.R. 202, 224 (Bankr. E.D.N.Y. 2011). This requires that a defendant act with a wrongful purpose or use wrongful means. "[A]s a general rule, the defendant's conduct must amount to a crime or an independent tort. Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103, 3 N.Y.3d 182 (N.Y. 2004). Sufficiently culpable conduct may also include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions,

28

and some degrees of economic pressure." *Scutti Enters.*, 322 F.3d at 216 (internal citations omitted).

Regardless of whether Roy has sufficiently pled criminal or tortious conduct on the part of the Defendants, the complaint alleges conduct directed at the wrong parties. "As federal courts applying New York law have recognized, conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel*, 3 N.Y.3d at 192 (collecting cases). KLG and Fox's conduct was not directed at the Debtors, which is the third party whose relationship with Roy was allegedly damaged by their actions; it was directed at Roy himself. *See* Compl. ¶ 74. Roy asserts that the Defendants

> interfered with [a business relationship between the Managers and Debtors] by, *inter alia*, using confidential information *gathered from the managers* and towards its bank clients, using an illegal foreclosure action to justify *de-valuing the Managers' bid* for the benefit of its bank clients, failing to properly calculate the bids, and failing to properly disclose its numerous, disqualifying relationships.

*Id.* Given that Roy only alleges a business relationship with the Debtors in the complaint, *see id.* at ¶ 73, he fails to allege any actions taken against the Debtors by the Defendants. Roy's tortious interference claim against the Defendants is ill founded.

For the above-mentioned reasons, the Plaintiffs' tortious interference claim is dismissed.

## F.  The Fraud Claim

The Plaintiffs' final claim alleges that the Defendants fraudulently failed to disclose their conflicts regarding Brown Publishing, the Managers, and the PNC Bank Group, which caused the Plaintiffs' failure in the sale.

"'Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which

the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.'" *Solow v. Citigroup, Inc.*, 507 F. App'x 81, 83 (2d Cir. 2013) (summary order) (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)); *accord Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015) (same). Moreover, "a plaintiff must allege facts that give rise to a strong inference of fraudulent intent." *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 247 (S.D.N.Y. 2011) (internal citations and quotation marks omitted).

As mentioned above, claims based on fraud are subject to the heightened pleading standard found in Rule 9(b). In particular, a party asserting fraud "must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "Rule 9(b) is satisfied when the complaint specifies 'the time, place, speaker, and content of the alleged misrepresentations;' how the misrepresentations were fraudulent; and the details that 'give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.' " *Schwartzco Enters. v. TMH Mgmt., LLC*, 60 F.Supp.3d 331, 344 (E.D.N.Y.2014) (Spatt, J.) (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir.2013)). This "serves to 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.'" *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).

Brown Media fails to allege the required particularity required under the heightened pleading standard. The only allegations in the complaint that are specific to Brown Media are contained in paragraphs 40 and 41. These allegations generally contend that K&L represented Brown Media in its failed attempt to acquire assets of Brown Publishing prior to Brown Media's

retention of Levy and that "Fox participated in negotiations between PNC Bank Group and Brown Media." Compl. ¶ 41. Such vague allegations fail to provide any facts or detail regarding the Defendants' allegedly fraudulent acts or omissions as they pertain to Brown Media.

Brown Media is required to detail what omissions each defendant made, the context of the omissions, how they misled Brown Media and what the Defendants obtained through the fraud. *See Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001) (summary order). The complaint does not provide detail regarding *any nondisclosures or misrepresentations* made by the Defendants that specifically relate to Brown Media. Moreover, there is not a single allegation that one of the Defendants either made a misrepresentation or failed to disclose anything regarding Brown Media for the purpose of defrauding Brown Media. These conclusory allegations are insufficient to sustain a fraud claim under Rule 9(b). As such, the Brown Media's fraud claim must be dismissed.

Finally, both of the Plaintiffs' fraud claims also fail to successfully allege a fraud claim due to their failure to properly plead that they suffered recoverable damages. Federal district courts interpreting New York State law have held that merely asserting that the Plaintiffs "suffer[ed] damages" without particular facts as to how they were damaged do not satisfy the notice requirement of *Iqbal* and *Twombly*. *Int'l Bus. Machines Corp. v. Dale*, No. 7:11-cv-951, 2011 WL 4012399, at *2 (S.D.N.Y. Sept. 9, 2011) (internal citations omitted).

With respect to Roy, even if the Court were to read into the complaint a specific claim of damages in the form of a bid deposit of $765,000 submitted in connection with Brown Media's failed bid, recovery is barred for two reasons: (1) the complaint only alleges that *Brown Media* bid submitted a bid; and (2) Roy is precluded from recovering a loss suffered by the *corporation*. The complaint itself makes no mention of Brown Media's lost bid deposit; the Court learned of it

through the parties' motion papers. However, reading the complaint in a light most favorable to the Plaintiffs, it is clear that Brown Media submitted a bid and therefore lost the resulting bid deposit. The Court cannot glean from the complaint that Roy suffered any loss relating to the bid deposit, and, as discussed in Section II.B.2, Roy is unable to receive relief for damage done to Brown Media. *See Gordon v. Fundamental Inv'rs, Inc.*, 362 F. Supp. 41, 45 (S.D.N.Y. 1973) ("Relief for harm done to the corporation is ordinarily awarded to the corporation, not to its shareholders individually."). The complaint's lack of allegations relating to potential damages suffered by Roy due to the Defendants' alleged fraudulent conduct is fatal on its own.

For the above-mentioned reasons, the Plaintiffs' fraud claim is dismissed.

## G. Leave To Amend

The Plaintiffs have argued that rather than dismissing their claims, the Court should allow them to amend their pleading. According to Rule 15(a), a party may amend a pleading "by leave of court or by written consent of the adverse party ... [L]eave shall be freely given when justice so requires [.]" FED. R. CIV. P. 15(a). Courts have liberally interpreted this Rule. *See D.C.R. Trucking & Excavation, Inc. v. Aetna Cas. And Sur. Co.*, No. 96-cv-3995, 2002 WL 32096594, at *8 (E.D.N.Y. Oct. 31, 2002). The power to amend a pleading is within the discretion of the District Court. *See Gursky v. Northwestern Mut. Life Ins. Co.*, 139 F.R.D. 279, 281 (E.D.N.Y. 1991) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L.Ed. 222 (1962)); *see also Zahara v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). According to the Second Circuit, "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. Cty. Of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999), *overruled on other grounds*, *Gonzaga v. Doe*, 536 U.S. 273, 122 S. Ct. 2268, 153 L.Ed. 2d 309 (2002).

Amendment should only be denied for legitimate reasons such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008). "The Rule reflects two of the most important principles behind the Federal Rules: pleadings are to serve the limited role of providing the opposing party with notice of the claim or defense to be litigated ... and mere technicalities should not prevent cases from being decided on the merits." D.*C.R. Trucking & Excavation, Inc.*, 2002 WL 32096594, at *8 (quoting *Monahan v. N.Y. City Dep't of Corrections*, 214 F.3d 275, 283 (2d Cir. 2000), *cert denied*, 531 U.S. 1035, 121 S. Ct. 623, 148 L.Ed. 2d 533 (2000)).

Nevertheless, a "bare request to amend a pleading" contained in a brief, which does not also attach the proposed amended pleading, is improper under Rule 15. *See, e.g.*, *Curry v. Campbell*, 06-cv-2841, 2012 WL 1004894, at *7 (E.D.N.Y. Mar. 23, 2012) ("To satisfy the requirement of particular[it]y in a motion to amend a pleading, the proposed amended pleading must accompany the motion so that both the Court and opposing parties can understand the exact changes sought" (citing *AT&T Corp. v. Am. Cash Card Corp.*, 184 F.R.D. 515, 521 (S.D.N.Y. 1999))); *see also Evans v. Pearson Enters., Inc.*, 434 F.3d 839, 853 (6th Cir. 2006) ("We agree with several of our sister circuits that a bare request in an opposition to a motion to dismiss— without any indication of the particular grounds on which amendment is sought ...—does not constitute a motion within the contemplation of Rule 15(a)." (quoting *Confederate Mem'l Ass'n, Inc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993))).

Courts may use their discretion to hold the motion to dismiss in abeyance pending the filing of the proposed pleading or deny the motion to amend without prejudice. *See AT&T Corp.*, 184 F.R.D. at 521.

The Plaintiffs failed to formally move for leave to amend the complaint or to provide a proposed amended pleading. Instead, in opposition to the Defendants' motion to dismiss, the Plaintiffs argue that the Court should grant them leave to file an amended complaint if it were to find the claims deficient.

Accordingly, the Court finds that the Plaintiffs' bare-bones request to amend the complaint is procedurally improper under Rule 15 and, in its discretion, denies it on that basis without prejudice and with leave to renew.

### III. CONCLUSION

For the reasons set forth above, the Defendants' motion pursuant to Rule 12(b)(6), to dismiss the Plaintiffs' complaint is granted in part and denied in part. The Defendants' motion to dismiss is granted without prejudice (1) with respect to all claims asserted by Roy and (2) with respect to Brown Media's tortious interference with prospective economic relations and fraud claims. The Defendants' motion to dismiss is denied with respect to Brown Media's breach of fiduciary duty claim.

The Court denies without prejudice the Plaintiffs' request for leave to amend as procedurally improper, and grants the Plaintiffs leave to renew their request to file an amended complaint in a manner consistent with FED. R. CIV. P. 15 within sixty days of the date of this decision.

It is **SO ORDERED**:

Dated: Central Islip, New York

February 28, 2018

_\_\_/s/ Arthur D. Spatt\_\__

ARTHUR D. SPATT

United States District Judge